**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **FRANK CINATL,** ) | |
| ) | |
| **Plaintiff,** ) | **No. 10 C 2398** |
| ) | |
| **v.** ) | **Magistrate Judge** |
| ) | **Jeffrey Cole** |
| **MICHAEL J. ASTRUE, Commissioner of** ) | |
| **Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Frank Cinatl, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("Disability Benefits") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423(d)(2). This Court has jurisdiction pursuant to 42 U.S.C § 405(g).

## I.
## PROCEDURAL HISTORY

Mr. Cinatl filed for disability benefits on December 21, 2005, alleging disability since March 23, 2001, (R.151-153), as a result of neck pain, shoulder pain, and depression. (R. 155, R. 189). His application was denied initially and upon reconsideration, (R.92, R. 101), and he timely requested a hearing before an Administrative Law Judge ("ALJ"). (R.105).

The Administrative Law Judge ("ALJ") convened a hearing on November 6, 2008. Mr. Cinatl and his wife, Mrs. Rachelle Cinatl, testified along with Dr. Rousch, a medical expert, and Mr. Shwice, a vocational expert. (R.25-89). On April 16, 2009, the ALJ issued a finding that Mr. Cinatl was not disabled. (R. 12, R.24). On February 16, 2010, the Appeals Council denied Mr. Cinatl's request for review, thereby making the decision of the Commissioner final. (R. 1). *See* 20 C.F.R. §§

404.995.  Shortly thereafter, Mr. Cinatl filed this cause of action, appealing the decision under 42 U.S.C. § 405(g).  The parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. §636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Mr. Cinatl was born on July 8, 1966, making him forty-two years old at the time of the ALJ's decision.  (R.12).  He completed the 12th grade, taking regular classes.  (R.160).  From 1993 to 2001, he worked as delivery driver for various types of businesses, including a pet food delivery service.  (R.156).  He also worked as a ramp agent for an airline at O'Hare Airport.  (R. 156).  Mr. Cinatl explained in his initial filing for disability benefits that he was injured in a motor vehicle accident in 2000 that made it impossible for him to work.  (R. 155).  Mr. Cinatl's insured status expired March 31, 2005.  (R. 28)

### B.
### Medical Evidence

### 1.
### Physical Impairments

Mr. Cinatl's medical records pertinent to this claim begin on April 15, 2000, when he went to an orthopedics clinic complaining of shoulder and neck pain following a motor vehicle accident.  (R. 247).  A physician monitored Mr. Cinatl's condition throughout that summer, indicating limited cervical motion, fluctuation in pain, and responses to acupuncture therapy.  (R. 233-244).  In August

2000, Mr. Cinatl began receiving cervical epidural injections at St. Alexius Medical Center. (R. 221-231). In November 2000, he was diagnosed with Cervical Radiculopathy. (R.221-231).

Later that year, Mr. Cinatl's was also diagnosed with Left Shoulder Impingement Syndrome. (R.257). On December 7, 2000, Mr. Cinatl's had arthroscopic surgery on his left shoulder. (R.255-256). Treatment notes in the months following the operation show significant improvement in pain, range of motion, and strength. (R. 251-257). However, in August 2001, Mr. Cinatl's surgeon noted the recurrence of neck pain, finding it indicative of cervical irritability at his C-5 and C-6. (R. 251). The surgeon recommended an MRI of his spine. (R.251).

Many of Mr. Cinatl's medical records from 2002 through 2003 come from his primary physician, Dr. Boskovic, and most, if not all, are illegible. (R. 269-279).

In 2004, Mr. Cinatl went to the University of Illinois at Chicago Medical Center complaining of neck pain, shoulder pain, bicept and tricept pain. (R.300). An MRI of Mr. Cinatl's cervical spine showed multiple herniated discs at C5-6 and C6-7. (R. 300, R. 340). In November 2005, after several appointments at the UIC Medical Center, Mr. Cinatl was diagnosed with C5-6 and C6-7 degenerative disease with bilateral foraminal stenosis. (R. 293). An orthopedic surgeon at UIC recommended an anterior cervical disketcomy with allograft, arthrodesis, and plate. (R. 292). Mr. Cinatl never underwent the surgery. (R.420)

Throughout 2005, Mr. Cinatl was also treated at a pain clinic for neck and right arm pain. (R. 319-320). Treatment notes document limited extension flexibility. (R. 344). Notes also indicate that Mr. Cinalt was taking Norco 10/325 seven times per day and receiving cervical facet injections. (R. 319). At times, Mr. Cinatl's pain was livable on a daily basis and the relief provided

by medication was 100%.  (R. 324; R. 330).  However, at the beginning of 2006, he suffered a marked increase in the pain, defined by moderate and constant aching and stabbing.  (R. 339).

In 2006, Mr. Cinatl underwent a physical residual functional capacity assessment.  (R. 353).  The assessment established that Mr. Cinatl had only exertional limitations: occasionally lifting no more than 20 pounds, frequently lifting no more than 10 pounds, standing or walking with normal breaks for about 6 hours in an 8-hour work day, sitting with normal breaks for about 6 hours in an 8-hour work day, unlimited restrictions on ability to push and/or pull.  (R. 354).  The findings were affirmed in the medical portion of the determination.  (R. 362).

In 2007, Mr. Cinatl began treatment at Alexian Brothers. (R. 363-441).  His diagnosis there was consistent with those previously made by other physicians, including cervical disc degenerative disease and radiculopathy.  (R. 409).  Despite these diagnoses, by 2007, Mr. Cinatl had begun general exercising and lifting weights.  (R. 424).

## 2.
### Mental Impairments

It is difficult to pin down exactly when Mr. Cinatl's mental impairments began.  While he claims he was treated for depression as early as 2001, (R. 631), records provided by Mr. Cinatl's attorney to substantiate that claim do not contain dates, thereby preventing a conclusive determination as to when they were composed.  (R. 636-637).

Mr. Cinatl's attorney also provided a note from his primary care physician, which stated that he was prescribed medicine for depression since 2003.  (R. 639).  However, the first legible documentation of Mr. Cinatl's depression comes from a treatment note dated May 6, 2005.  (R. 266).  This was after Mr. Cinatl's insurance had expired.  (R. 28).  Although Mr. Cinatl's primary physician

4

documented his depression throughout 2005, medical records from other facilities do not mention him suffering from any mental impairment. (R. 264; R. 318-351).

The clearest indication of Mr. Cinatl's mental health derives from a psychiatric evaluation performed at Alexian Center for Mental Health on April 21, 2006. (R. 497). The evaluation noted that Mr. Cinatl reports low energy, poor interest, adhendonia, decreased motivation, decreased asleep, difficulty sleeping, and feeling overwhelmed, hopeless, and helpless. (R. 506). Following the evaluation, he was diagnosed with "major depressive disorder, recurrent, severe, nonpsychotic, and attention deficit disorder, inattentive type." (R. 507). Mr. Cinatl continued psychiatric treatment at Alexian throughout 2007. (R. 507-526).

### C.
### Administrative Hearing Testimony

### 1.
### The Medical Expert's Testimony

Dr. Rousch testified that Mr. Cinatl had several medically determined impairments, including cervical spine disease, degenerative arthritis, stenosis with chronic pain, and chronic impingement syndrome. (R. 29). She also testified that Mr. Cinatl has suffered from depression since 2005. (R. 29). Dr. Rousch acknowledged these impairments had "more than a slight affect" [sic] on Mr. Cinatl's ability to perform the universe of work related activities from March 2001 until March 2005, but denied that the impairments equaled the severity of the criteria of any of the Listing of Impairments.

Dr. Rousch testified that Mr. Cinatl's medical records did not contain severe, clinically severe, or significant impairments that would prevent him from working six hours a day prior to the date of last insured. (R. 30). However, she conceded that his physical impairments would have

demanded restrictions in his ability to lift, postural activities, and manipulative limitations. (R. 30). She was unable to conclude whether Mr. Cinatl's mental condition improved from treatment by his primary physician, which allegedly began in 2002, or as a result of formal psychiatric treatment, which began in 2007, reasoning that the available records were illegible or scant. (R. 55)

## 2.
## The Plaintiff's Testimony

At his administrative hearing, Mr. Cinatl testified that he lived with his wife and two of their three children. (R. 33-34). He stated that he was unemployed but occasionally helped with a day-care center his wife was operating out of their home. (R. 33-34). Mr. Cinatl testified that his depression began after his shoulder operation in 2000 and that he been prescribed anti-depressants by his primary physician since 2002. (R. 36-38). Mr. Cinalt described the effects of his depression as feeling like his "life has been stopped." (R. 37).

Mr. Cinatl further testified that the pain he had previously suffered in his neck and arms were aggravated by a motor vehicle accident. (R. 39). He stated that initially he was placed on medication, administered epidural injections, underwent physical therapy, and received acupuncture. (R. 39). Mr. Cinatl testified that he experienced pain and tingling, limited motion in his neck and arms, numbness in his fingers, and a loss of strength on his right side. (R. 40-45). He averred his daily pain ranges between six and eight out of ten depending on the severity of the throbbing or stabbing. (R. 52). He testified that the pain keeps him up at night, disrupting his sleep, and causing fatigue the following day. (R. 40). Repeatedly, Mr. Cinatl remarked that pain medication improved his condition in so far as he could function without extreme discomfort. (R. 47-51).

### 3.
### The Plaintiff's Wife's Testimony

Mrs. Rachelle Cinatl testified to her knowledge of her husband's physical impairments, depression, and treatment during the period in question. (R. 63-77). She testified that his depression emerged from fear his physical injuries would prevent him from providing for his family. (R. 66). She testified that his mood became progressively worse, and that he was eventually advised by his primary care physician to see a psychiatrist. (R. 71). However, formal treatment was delayed because they needed a psychiatrist who accepted Medicaid. (R. 69-73).

### 4.
### The Vocational Expert's Testimony

Mr. Schwice, the vocational expert, testified to Mr. Cinalt's employment potential for the period of time in which he is claiming disability. (R. 79-89). Again, this period is between when Mr. Cinatl first alleges disability (March 31, 2001) and his insurance expires (March 31, 2005). (R. 151-153; R. 28). Mr. Schwice first testified to Mr. Cinatl's past employment, including work as a delivery driver for a pet food supplier (heavy to very heavy range of physical exertion), delivery driver for an appliance store (heavy range of physical exertion), bus driver (medium range of physical exertion) and ramp agent for an airline (heavy range of physical exertion). (R. 79-81). Each of Mr. Cinatl's past jobs constituted low-skill or semi-skilled work that is generally performed in the national economy with medium to heavy physical exertion. (R. 79-81).

Mr. Schwice acknowledged that Mr. Cinatl would no longer have been able to meet the demands of his former occupations. (R. 81). However, he testified that Mr. Cinatl could have obtained other employment, including work a cashier position, gate guard, lobby attendant, and informational clerk. (R. 82). These jobs were within the restrictions testified to by Dr. Rousch, as

they did not require overheard work, climbing ropes, ladders, or scaffolds, or more than ten pounds of lifting. (R. 30; R. 82). Mr. Schwice testified to the prevalence of these jobs in the regional economy: cashier (~4,000), gate guard or lobby attendants (~3,000), informational clerk (~4,000). (R. 82-83). He also asserted that these jobs existed in several regions of the national economy. (R. 83). Mr. Schwice concluded that Mr. Cinatl was capable of working in the national economy during the material time at issue. (R. 83). When asked by Mr. Cinatl's attorney whether Mr. Cinatl would have been able to compete in the marketplace if he needed a fifteen-minute break for each hour of work (~ 25% of the work day), as his impairments allegedly required, Mr. Schwice responded he could not, at least for the jobs mentioned. (R. 84).

## D.
### The ALJ's Decision

The ALJ held that Mr. Cinatl was not under a disability during the period in which he was insured. (R. 24). The ALJ first found that Mr. Cinatl was not engaged in substantial gainful employment at any time material to the decision. (R. 17). Next, and without distinction, the ALJ stated that at least one of Mr. Cinalt's impairments (degenerative disc disease of the cervical spine, impingement syndrome of the left shoulder, and impairments in the lumbar spine) was currently "severe." (R. 18). The ALJ did not find Mr. Cinatl suffered from depression before the expiration of his insured status, rejecting doctor's letters submitted without "any contemporaneous patient progress notes." (R. 19). He stated that a single record, from 2005, was insufficient to evaluate the severity of Mr. Cinatl's depression prior to the expiration of his insurance. (R. 19).

Proceeding to Step 3 of the sequential analysis, the ALJ found that by the time Mr. Cinatl's physical impairments became severe enough to come within the criteria of Listing §1.04A (February

24, 2006), his insurance had expired and he was no longer entitled to legal disability status. (R. 19). The ALJ supported this conclusion by noting that on up to three occasions before the date of last insured, Mr. Cinatl reported pain as low as 3 on a 10-point scale, and on one occasion, expressed to his physician that medication was controlling his pain. (R. 21).

At Step 3, the ALJ addressed also Mr. Cinatl's averred mental impairments, taking issue with the fact that Mr. Cinalt's delayed psychiatric assessment, despite recommendation, until after his insurance expired. (R. 21). The ALJ stated that the current existence of a mental disorder does not determine the severity of impairment flowing from it in the past, and that records indicated that Mr. Cinatl's symptoms were "medically mild ... [and] ... controlled by medications prescribed by the primary care physicians." (R. 22). The ALJ surmised that Mr. Cinatl's mental impairments only became severe under Listing §12.04 when he finally sought treatment in 2007, which was after the date of his last insured. (R. 22).

Relying on Dr. Rousche's assessment of Mr. Cinatl's physical limitations, the ALJ concluded that Mr. Cinatl could have obtained employment that did not require lifting and/or carrying of more than 10 pounds on a frequent and occasional basis and that he was capable of sustaining performance of unskilled work on a regular and continuing basis during the period at issue. (R. 23). At Step 4, the ALJ concluded that Mr. Cinatl would be unable to perform any of his past jobs. (R.23). At step 5, the ALJ, relying on the testimony of the vocational expert, found that there were jobs that existed in significant numbers in the national economy which Mr. Cinatl could have adapted and performed. (R. 23-24).

## III.
## DISCUSSION

### A.
### Standard of Review of the ALJ's Decision

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The standard is a "lax" one. *Id.* Hence, the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger,* 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, it is not abject, *Parker v. Astrue*, 597 F.3d 920 (7th Cir.2010). The court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d

329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Moreover, even though the Seventh Circuit has explained that its "logical bridge" requirement is no more demanding that what it requires of the district court, - "...we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Unlike an ALJ's decision, a district court's decision can be affirmed on any ground contained in the record. *See Brooks v. Ross*, 78 F.3d 574, 578 (7th Cir. 2009).

## B.
## The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir.2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next

step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
### Analysis

Mr. Cinatl alleges there were several errors in the ALJ's decision. First, he complains that the ALJ's consideration of his physical limitations was based on errors of fact in the record. He also alleges that critical evidence was ignored. Next, Mr. Cinatl argues that the ALJ misapplied the criteria of Listing §1.04(A) provided by the Social Security Regulations. Finally, Mr. Cinatl's claims the ALJs conducted a "paltry analysis" of his mental impairments under Listing §12.04. (Pl. MSJ). The totality of Mr. Cinatl's complaints comprise the oft-repeated failure to "build a logical bridge" argument introduced by the Seventh Circuit in *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996).

**1.**

**The ALJ Failed To Build A "Logical Bridge" Between the
Evidence and His Conclusions**

**a.**

**The ALJ's Decision Was Based On Errors of Fact Contained in the Record**

The ALJ misperceived certain evidence in determining whether Mr. Cinatl had residual functional capacity to perform a range of unskilled, light work. (R. 19). First, he inaccurately characterized a medical record dated six weeks before Mr. Cinatl's insured status expired as indicating that Tylenol, aspirin and Hydrocodone were controlling Mr. Cinatl's pain. (R.21). The record, however, simply states that these were the medicines Mr. Cinatl was taking. Mr. Cinatl reported that his pain was, in fact, sharpening and worsened with movement of his neck and head. (R. 315). The ALJ relied on this misperceived evidence in finding Mr. Cinatl was functionally capable prior to the date of his last insured. (R. 21).

Second, the ALJ incorrectly found that Mr. Cinalt, in a treatment note documented one month before his insurance expired, reported his normal level of pain to be 4 out of 10, and it was therefore "tolerable." (R. 21). In fact, the record cited by the ALJ shows Mr. Cinatl reported his pain to be 6 out of 10 but that he could tolerate it if it were 4 out of 10. (R. 320). This mistake appears to have influenced the finding that Mr. Cinatl was functionally capable at Step 4. (R. 21).

The two instances of the ALJ's mischaracterization of evidence complicate the likelihood of a "rational basis" for his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). However, mischaracterizations of facts do not always constitute reversible error. *Berger v. Astrue*,

516 F.3d 539, 545 (7th Cir. 2008) (ALJ opinion not flawless but rested on sufficient basis to support conclusion). What matters is whether such errors prove to be "outliers" and do not indicate that the ALJ's decision lacked an adequate factual basis. *Berger*, 516 F.3d at 544. The relevant inquiry with regard to Mr. Cinatl's complaint then, is, whether the ALJ's decision had an adequate factual basis absent the three mischaracterizations of evidence. *Id.*

In *Steele v. Barnhart*, 290 F.3d 936 (7th Cir. 2002), a firefighter sought review for denial of disability benefits. The ALJ found that the claimant's medical notes demonstrated his epileptic condition was "unremarkable" and his seizures were being controlled by medicine. *Id.* at 939. In remanding, the Seventh Circuit noted, "the chief problem lies in the ALJ's mischaracterization of the medical evidence." *Id.* at 940. Specifically, the Court was "left to wonder" how the ALJ's finding that the medical evidence was "unremarkable" could concur with the record's express revelation that the claimant suffered a "neuro-physiological disturbance." *Id.* The Social Security Commissioner in that case conceded that a "report demonstrating seizure episodes 'should be regarded as remarkable'." *Id.*

With regard to the ALJ's first mischaracterization, it is conceivable that if a claimant controlled his pain with low-strength, over-the-counter medication, he would be capable of performing a range of light work. *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002) (Reliance for pain control on over-the-counter analgesics support conclusion that pain is not disabling); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (reliance on drugs not intended to treat severe pain suggests exaggeration). However, as in *Steele*, where the ALJ found that the seizures were unremarkable, the ALJ in this case "depreciated the medical evidence" in finding that Mr. Cinatl's

pain was being controlled by his medication without any support for it in the record cited. *Steele*, 290 F.3d at 230. It also seems noteworthy that like the concession in *Steele* that an error was made by the ALJ, the Commissioner in this case concedes: "the ALJ might have misadvertantly stated ... Plaintiff told his treating physician that he was able to control his pain with daily aspirin, Tylenol." (Df. MSJ).

A similar mistake occurred with the ALJ's second mischaracterization. Again, the ALJ found Mr. Cinatl's pain to be "tolerable" based on the belief he reported it as 4 out of 10 when the cited record reveals Mr. Cinatl's reported pain was actually 6 out of 10. (R. 320). An ALJ must consider a claimant's subjective complaint of pain if supported by medical signs and findings. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). Here, the ALJ depreciated the intensity of Mr. Cinatl's pain by misreading the record. *Steele*, 290 F.3d at 240.

Along these lines, the ALJ pointed to a report from January 30, 2006, in which Mr. Cinatl listed the activities that were limited by his pain as: "work/housework." (R. 343). The ALJ said that this belied Mr. Cinatl's testimony that he was unable to function during that period due to his pain. (R. 21). But Mr. Cinatl didn't say that he was totally incapacitated; he testified as to how his normal activities were limited by, or exacerbated, his pain. (R. 33-34, 40-47). "An ALJ may not ignore a claimant's limiting qualifications with regard to h[is] daily activities." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). The fact that Mr. Cinatl could sometimes help out his wife or do a little work around the house doesn't really undermine his claim that he was unable to tolerate working five days a week, week after week. The Seventh Circuit has cautioned against placing "undue weight" on a claimant's household activities

in assessing the claimant's ability to hold a job outside the home. *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). The ability to complete housework is not *per se* determinative on the issue of capability in the work force. *Carradine*, 360 F.3d at 755-756 (ability to drive, shop and do housework "does not follow ability to maintain effort over the full course of the work week).

The ALJ's mischaracterizations buttress its finding at Step 4 that Mr. Cinatl retained residual functioning capacity. They are not mere "outliers." *Berger*, 516 F.3d at 539. It is inadequate to have a factual basis built on misinterpreted evidence. *Id*. Without an adequate factual basis, the ALJ could not have constructed an "accurate and logical bridge from the evidence." *Godbey v. Appel*, 239 F.3d 803 (7th Cir. 2001).

### b.
### The ALJ Ignored Critical Facts In The Record

Mr. Cinatl next complains that the ALJ ignored critical evidence. He claims the ALJ glossed over records relating to his cervical degenerative disc disease, the severity of his pain, and his prescribed medication. (Pl. MSJ).

It is well accepted that an "ALJ need not mention every piece of evidence, so long as he builds a logical bridge from the evidence to his conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Failure to mention evidence favoring the claimant does not always constitute reversible error. However, if failure to mention evidence is combined with selective focus on records favoring denial of benefits, it may follow that the ALJ did not review the record with the requisite care. Therefore, the relevant inquiry is whether failure to reference the records cited by Mr.

Cinatl in his motion for summary judgment demonstrate that the ALJ did not give the record the care it deserved, thereby failing to build a logical bridge. *Denton*, 596 F.3d at 435.

Mr. Cinatl first alleges that the ALJ only used "one sentence to discuss Exhibit 1F." (Pl. MSJ). In doing so, Mr. Cinatl argues that the ALJ ignored evidence of neck pain, shoulder pain, numbness in fingertips, and prescription medication. (Pl. MSJ). Exhibit 1F is made up of records related to Mr. Cinatl's physical complaints following a motor vehicle accident in 2000. (R. 211-248). The ALJ began his review of this exhibit in August 2000, instead of April 2000, when Mr. Cinatl first presented himself at a physician's office complaining of pain. (R. 20; R. 246). Notably, the ALJ omitted a record revealing tingling in the left hand, as well as a record detailing medication, including Vicodin, that had been prescribed. (R. 228; 244).

However, the ALJ cited other evidence from the exhibit, including that Mr. Cinatl was initially diagnosed with a cervical sprain and left shoulder contusion, and detailed each instance of epidural injections he received during that time. (R. 20). The ALJ did not need to address each page of Exhibit 1F, and its analysis was sufficient to build a logical bridge. *Denton*, 596 F.3d at 425. (ALJ need not mention every piece of evidence).

Mr. Cinatl's second complaint is that the ALJ "completely ignored Exhibit 3F." (Pl. MSJ). Exhibit 3F is comprised of medical records from Mr. Cinatl's primary physician from October 29, 2003 until December 6, 2005. (R. 258-279).

While the ALJ mentioned Exhibit 3F only to observe that Mr. Cinatl was a "no show" for several appointments, this is not "cherry picking" as Mr. Cinatl alleges, but rather a consequence of

Exhibit 3F being entirely composed of illegible records. (Pl. MSJ). While Mr. Cinatl may feel Exhibit 3F contains critical evidence supporting his claims, his brief fails to reference any particular points. Instead, there is a block citation to over twenty pages of scribbled jottings. "Judges are not like pigs, hunting for truffles buried in the record." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). But on a truffle hunt, at least one knows when a truffle is unearthed; here, without some guidance form Mr. Cinatl's brief, there's no way to tell.

Mr. Cinatl's third complaint is that the ALJ ignored Exhibit 6F. (Pl. MSJ). Exhibit 6F contains records from the University of Illinois-Chicago Medical Center. (R. 291-309). This allegation is not persuasive. While Exhibit 6F contains relevant evidence, including that Mr. Cinatl's cervical spine showed herniated discs and degenerative disease at C5-6 and C6-7 with bilateral foraminal stenosis, it is identical to that in Exhibit 4F, which the ALJ cited in his decision. (R. 21; R. 292-300). An ALJ "need not mention every piece of evidence," particularly evidence identical to that already cited in its opinion. *Denton*, 596 F.3d at 425.

Mr. Cinatl's fourth complaint is that the ALJ ignored his live testimony. (Pl. MSJ). He alleges that the ALJ found complaints of pain to be descriptive of recent functional capacity, rather than capacity during the material time at issue. (Pl. MSJ). An ALJ is directed to consider subjective complaints of pain if supported by medical signs and findings. *Clifford*, 227 F.3d at 871. An ALJ may not sweepingly neglect all "evidence favoring the claimant." *Id. at* 871. In *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001), the claimant challenged an ALJ's finding regarding his subjective complaints of pain. The ALJ rejected the claimant's testimony because of "inconsistencies with the objective medical evidence." *Id.* at 887. On appeal, the Seventh Circuit noted that the ALJ relied

solely on evidence that contradicted the claimant's complaints and criticized the ALJ for failing to examine "both the evidence favoring the claimant as well as the evidence favoring the rejection." *Id* at 888. It held that where evidence supports "a claimant's complaint of pain, the ALJ cannot merely ignore the claimant's allegations." *Id*. Because the court could not determine whether the ALJ "investigated all avenues" relating to the claimant's pain, it remanded the case for further determination. Id.

In this case, as in *Halter*, the ALJ relied only on evidence it believed showed improvement in Mr. Cinatl's condition. For example, the ALJ's determination that Mr. Cinatl's testimony was reflective of "more recent level of functioning" was based solely on two medical records showing improvement in pain prior to date of last insured. (R. 21). The ALJ failed to mention the considerable number of medical records corroborating Mr. Cinatl's subjective complaints of severe pain during the material time at issue. (R. 244-245, 300, 320). In doing so, the ALJ summarily neglected the entirety of evidence favoring Mr. Cinatl. *Clifford*, 227 F.3d at 871. If the ALJ did not consider evidence corroborating Mr. Cinatl's subjective complaints persuasive, it made no attempt to explain why it was "overcome by the evidence on which she relied." *Halter*, 245 F.3d at 888-889.

In focusing solely on evidence that supports denial of benefits, the ALJ did not review the record with the care it deserves. *Heckler*, 609 F. Supp. at 1118. Accordingly, it could not have built an accurate and logical bridge from the evidence to its conclusion. *Denton* 596 F.3d at 425.

## The ALJ Did Not Correctly Apply Listing §1.04

Mr. Cinatl next complains that the ALJ misapplied Listing §1.04(A) at Step 3. (Pl. MSJ). He argues that the ALJ incorrectly considered the "ineffective use of the claimant's upper extremities", as called for in Listing §1.00B. (Pl. MSJ).

Before considering the relationship between Listing §1.04(A) and Listing §1.00B, if any, we shall review whether at Step 3 the ALJ considered the correct evidence to put Mr. Cinatl in consideration of severity under Listing §1.04(A). Mr. Cinatl meets Listing §1.04(A) if the evidence satisfies a disorder of the spine resulting in a compromise of a nerve root and nerve root compression. 20 CFR Pt. 404, Subpt. P, App. 1. Listing 1.04(A).

The claimant bears burden to satisfy all the criteria of the listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). However, the ALJ should also mention the listings he is considering. Failure to do so, combined with a "perfunctory analysis" may require remand. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) An ALJ should stick to the special techniques set forth in the Listing regulations. *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008) (Remand where ALJ failed to discuss required four areas of limitation provided by Listing §12.00). An ALJ is required to articulate at a "minimal level his analysis of the evidence." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2001). Failure to fully consider the impact of non-severe impairments requires reversal. *Denton*, 596 F.3d at 423.

By the time of his administrative hearing, Mr. Cinatl's medical records demonstrated that he suffered from degenerative disc disease. (R. 282). Degenerative disc disease is a spinal disorder

under Listing §1.04. 20 CFR Pt. 404, Subpt. P, App. 1. Listing 1.04(A). However, this fact is of little consequence if medical records do not show he suffered from degenerative disc disease, or any other disorder under Listing §1.04, prior to the date of his last insured, March 31, 2005. (R. 17).

Mr. Cinatl's medical records show signs of disc disease as early as 2003, when an exam revealed "degenerative osteophytic spurring" in Mr. Cinatl's neck at C5-C6. (R. 317). In 2004, a physician at UIC recorded that Mr. Cinatl "has multiple disc disease at C5-C6 and C6-C7." (R. 298). A radiology exam from February 2005, a month before Mr. Cinatl's date of last insured, revealed "degeneration of C5-C6 disc." (R.319). By November 2005, eight months after the date of last insured, a physician at UIC noted the "worsening of the C5-C6 degenerative disease" and suggested surgical intervention. (R. 282).

There is ample evidence that Mr. Cinatl suffered degenerative disc disease under Listing §1.04 prior to the date of last insured. (R. 282; R. 298; R. 317; R. 319). If the ALJ considered this evidence, and dismissed it, that process is unclear. The ALJ's failure to explain why he rejected Mr. Cinatl's evidence of degenerative disc disease raises the inference he did not consider it at all. *See Godbey*, 238 F.3d at 808. In addition, the ALJ's failure to evaluate the strongest evidence in favor of Mr. Cinatl for the purposes of meeting Listing §1.04(A) has precluded a meaningful review by this court. *Brindisi ex rel. Brindisi v. Barhart*, 315 F.3d 783, 786 (7th Cir. 2003) (failure to mention strongest evidence supporting claimant's claim for benefits under listing rendered opinion inadequate to permit appellate review).

The second requirement of Listing §1.04 is that Mr. Cinatl establish evidence of nerve root compression. 20 CFR Pt. 404, Subpt. P, App. 1. Listing 1.04(A). Nerve root compression is

characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, and motor loss accompanied by sensory or reflex loss. *Id*. Again, there must be evidence of nerve root compression before the date of last insured, March 31, 2005. (R. 17).

The medical records reveal that Mr. Cinatl was diagnosed with cervical radiculopathy as early as 2002. (R.221-231, 316). Radiculopathy is a nerve root disease or disorder. *Clifford*, 227 F.3d at 866. There is also evidence that Mr. Cinatl had limited neck motion and numbness, but mostly after his insurance expired. (R. 251, 298, 300, 318). There does not appear to be sensory or reflex loss in the medical evidence.

There is evidence to conclude that Mr. Cinatl suffered nerve root compression. (R. 221-231; R. 316). If the ALJ denied benefits because Mr. Cinatl did not sufficiently demonstrate nerve root compression under Listing §1.04(A), he failed to articulate this. *Godbey*, 238 F.3d at 808) (ALJ must articulate at minimal level his analysis of the evidence).

Because the ALJ did not expressly address Mr. Cinatl's degenerative disc disease or evidence nerve root compression, the case must be remanded for a more thorough analysis of the evidence at Step 3. *Ribaudo*, 458 F.3d 580, 583-84 (7th Cir. 2006) (Failure to mention Listing or evaluate evidence on its required criteria favorable to claimant constitutes insufficient analysis at Step 3)

### d.
### The ALJ Impermissibly Considered Listing 1.00B

In addition to remanding for a more thorough consideration of the requirements provided by Listing §1.04(A), *see Ribaudo*, 458 F.3d at 580, what is of equal concern is the ALJ's infusion of Listing §1.00B into his analysis of Mr. Cinatl's symptoms under Listing §1.04(A). To begin, Listing

§1.04(A) addresses disorders of the spine:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R Part 404, Subpart P, Appendix 1. Listing 1.04A.

Alternatively, Listing §1.00B defines loss of function for the purposes of the Listings on the musculoskeletal system:

> "Functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis ... the inability to perform fine and gross movements effectively on a sustained basis ... Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities."

20 C.F.R. Part 404, Subpart P, Appnedix 1, Listing 1.00B(2)(c).

Mr. Cinatl argues, as a matter of statutory construction, that Listing §1.04(A) does not require a finding of "ineffective use of extremities," or any other conditions provided in Listing §1.00B. (Pl. MSJ). He makes this argument by analogy, pointing out that other musculoskeletal Listings expressly reference the limitations set forth in Listing §1.00B, while Listing §1.04(A) does not. (Pl. MSJ). Mr. Cinatl's argument is that the Social Security Administration, in failing to list §1.00B as a requirement to meet severity under Listing §1.04(A), intended to make a finding of the latter independent from consideration of the former.

The Commissioner argues the ALJ was permitted to consider §1.00B, including the use of upper extremities, when determining whether Mr. Cinatl's impairment was severe under Listing §1.04(A). (Df. MSJ). The Commissioner offers that introductory information, like that in Listing §1.00B, is "relevant to the use of the listings in that body system." *See* 20 C.F.R. §404.1525(c)(2)

Mr. Cinatl's argument is grounded in the maxim *expressio unius est exclusion alterius*, which means "to include the one thing implies the exclusion of the other." *In Re Globe Bldg. Materials, Inc.*, 463 F.3d 631, 635 (7th Cir. 2006). The concept is premised on the assumption that a legislature's failure to include a particular factor equates its intent to reject that factor from inclusion. *Tri-State Terminals, Inc. v. Jesse*, 596 F.2d 752, 759 (7th Cir. 1979). However, the Supreme Court has warned that the maxim only has force when the items expressed are in an "associated group or series ... justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). Most importantly, *expressio unius est exclusion alterius* should never override a differing intent of the legislature. *Bland v. Comm'r of Internal Revenue*, 1939-2 C.B. 194 (7th Cir. 1939).

Mr. Cinatl correctly observes that several Listings in the musculoskeletal section (Listing §§1.00-1.08) expressly reference Listing 1.00B, and in particular, the requirement that a claimant be unable to ambulate effectively.[1] He also correctly observes that Listing §1.04(A) makes no such reference. And while Listing §1.04(A) is an "associated group or series" with the rest of the

---

[1] Listing §1.02B: "resulting in inability to ambulate effectively, as defined in 1.00B2b; Listing §1.03: "with inability to ambulate effectively, as defined in 1.00B2b; Listing §1.04C: resulting in inability to ambulate effectively, as defined in 1.00B2b; Listing §1.05: "medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b; Listing §1.06: "Inability to ambulate effectively, as defined in 1.00B2b".

musculoskeletal Listings that reference Listing 1.00B (*See* Footnote 1), it is proper to review legislative intent on the issue before deferring to *expressio unius est exclusion alterius*. *Bland* 1939-2 C.B. at 194.

On November 19, 2001, the Social Security Administration (SSA) issued a document reviewing and inviting questions related to its "Revised Medical Criteria for Determining Disability under the Muskoskeletal System." *See* Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 FR 58010-01. The SSA addressed the role of effective ambulation under Listing §1.04(A). In describing the requirements for another listing, Listing §1.04C, the document provides "an individual must be unable to ambulate effectively, as defined in 1.00B1 in the NPRM (final 1.00B2b,) which is *not* a requirement to meet final listing §1.04(A)." *Id*.

The Commissioner's position follows from expressed language in the Social Security Regulations (*See* 42 USCA APP., 20 CFR § 404.1525: "introduction to each body system contains information relevant to the use of the listings in that body system;"). However, it conflicts with the legislative history on the matter. *See* Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 FR 58010-01. Therefore, deference to *expressio unius est exclusion alterius* is appropriate to determine the will of the legislature over whether Listing §1.04(A) contemplates Listing §1.00B.

Because other Listings in the same musculoskeletal "group" reference Listing §1.00B (*See* footnote 1), and because throughout the Social Security Code introductory information is expressly referenced (*See* Listing §12.00H as required under Listing §12.04(c), the failure to include Listing

§1.00B as a requirement to meet severity under Listing §1.04A was intended. *Peabody Coal Co.*, 537 U.S. 149, 168 (2003). *See Also Craft v. Astrue*, (539 F.3d 668, 674 (7th Cir. 2008) (reversible error to not consider "B criteria" under Listing §12.00).

The ALJ's consideration of Listing §1.00B was improper. The case is remanded for consideration of the requirements of Listing §1.04(A).

## 2.
### The ALJ Correctly Applied SSR 83-20 To Claimant's Mental Impairment

Mr. Cinatl next complains that the ALJ erred in applying Social Security Regulation 83-20 in determining the onset date of his depression. (Pl. MSJ). While conceding there is no precise evidence as to the onset date, he alleges it may be inferred from his testimony, work history, and non-medical evidence. (P. MSJ)

The determination of onset in non-traumatic impairments under SSR 83-20 depends on the applicant's allegations, work history, and medical and other evidence concerning impairment severity. SSR 83-20. While the weight given the relevant evidence depends on the individual case, medical evidence serves as the primary element in the onset determination. *Id*. SSR 83-20 does not require an impairment to have reached the severity of an impairment listed in the regulations, as required under step three, but "[t]he onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Mr. Cinatl also cites *Wilder v. Apfel*, 153 F.3d 799 (7th Cir. 1998) for the proposition that subjective testimony without corroborative medical records could support a finding of onset depression. In *Wilder*, a security guard sought disability benefits four years after leaving her job, alleging that she was disabled due to severe depression. 153 F.3d at 799. The Court noted that the ALJ denied claimant's allegations of depression because there was not contemporaneous medical documentation. Id. at 802. It held this position to be legally erroneous: "what is required is contemporaneous corroboration of the mental illness, not necessarily contemporaneous medical corroboration." *Id*. *citing* SSR 83-20. In remanding with instruction to grant benefits, the Court concluded that requiring medical corroboration would be "a peculiarly unreasonable requirement in the case of depression, a notoriously under reported disease. *Wilder*, 153 F.3d at 802.

The Commissioner argues the ALJ's analysis met the requirements of SSR 83-20. (Df. MSJ). It notes first the lack of evidence on Mr. Cinatl's mental health treatment prior to the date of last insured. (Df. MSJ). It argues the ALJ adequately considered Mr. Cinatl's work history, subjective allegations, and medical evidence. (Df. MSJ)

In determining onset disability under SSR 83-20, medical evidence is the primary element. SSR 83-20. Here, the ALJ addressed the few, imprecise, records that indicated Mr. Cinatl suffered from depression prior to the date of his last insured. (R. 366; R. 639). The ALJ recognized that a psychiatrist did not diagnose Mr. Cinatl with depression until 2006, well after the expiration of his insurance. (R. 507). Finally, the ALJ addressed a note from Mr. Cinatl's primary physician (which was produced for the purposes of litigation in 2008) that stated that she treated him for depression since 2003. (R.639). The ALJ qualified the weight to be given the note with the fact that the

physician was not a psychiatrist, and did not maintain detailed records of the alleged treatment. (R. 21). In all, the ALJ sufficiently considered the medical evidence available to it. *Clifford*, 227 F.3d at 871.

The ALJ also considered Mr. Cinatl's work history. SSR 83-20. It accepted Mr. Cinatl's alleged onset date of disability, and found that he had not engaged in substantial gainful activity at any time material to his decision. (R. 18).

The ALJ also addressed Mr. Cinatl's testimony, a factor of consideration under SSR 83-20. ("determination of onset involves consideration of the applicant's allegations"). Acceptance or denial of Mr. Cinatl's live testimony amounts to a credibility determination. *Sims v. Barnhart*, 442 F.3d 536, 537-538 (7th Cir. 2006) (Where existence of symptom cannot be verified by medical evidence ALJ must base decision on credibility of the claimant's testimony). Credibility findings are due considerable deference. *Craft*, 539 F.3d at 678. They should not be disturbed unless "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). While an ALJ should not reject subjective complaints solely because they are not fully supported by the medical evidence, it may consider it as probative on the issue of the claimant's credibility. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (Discrepancies between medical evidence and testimony may suggest symptom exaggeration).

The ALJ's finding on Mr. Cinatl's onset depression was not patently wrong. *Prochaska*, 454 F.3d at 738. The ALJ considered Mr. Cinatl and his wife's live testimony. In doing so, it found it noteworthy that Mr. Cinatl failed to see a psychiatrist despite recommendations from his primary physician. (R. 22; R. 69-73). The ALJ also felt that Mr. Cinatl's failure to seek a psychiatric

evaluation until 2006 was due to the fact that his condition was mild. (R. 22). Without medical evidence to contradict this, the ALJ was entitled to make such a finding. *Craft*, 539 F.3d at 678 (court has less "freedom to review" credibility determinations based upon subjective testimony). In addition, following the mandate of SSR 83-20, the AJL relied on Dr. Rosch's findings about Mr. Cinatl's onset depression prior to the date of last insured. (R. 23).

While the ALJ's analysis of Mr. Cinatl's physical impairments was flawed, its treatment of Mr. Cinatl's mental impairments articulated the required "analysis of the evidence." *Clifford*, 227 F.3d at 871 ("minimal"). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder*, 529 F.3d at 413; *Binion*, 108 F.3d at 782. We also agree that to come within the purview of SSR 83-20 there must be a "legitimate medical basis." SSR 83-20. Mr. Cinatl's reliance on *Wilder* cannot overcome the deferential treatment given to the ALJ's credibility determinations, particularly given the illegitimacy of medical bases relied on to prove depression in this case. *Craft*, 539 F.3d at 678; SSR 83-20. The ALJ's conclusion as to Mr. Cinatl's onset date of depression was supported by substantial evidence. 42 U.S.C. §§405(g).

## CONCLUSION

The plaintiff's motion for summary judgment [12] is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 5/6/11